**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JOHN DOE,** | **CASE NO.:** |
| Plaintiff, | |
| v. | **JUDGE** |
| **CASE WESTERN RESERVE UNIVERSITY,** | |
| Defendant | |

**COMPLAINT**
**(Jury Trial Demanded)**

Plaintiff, John Doe, sues Defendant, Case Western Reserve University ("CWRU") and alleges as follows:

**<u>INTRODUCTION</u>**

1.      Plaintiff seeks relief against CWRU following CWRU's wrongful and unjustified imposition of sanctions against him based on a fellow student's false and unproven allegations of intimate partner violence and non-consensual sexual intercourse.

2.      This injustice was the direct result of CWRU's: (a) failure to adhere to CWRU's own policies throughout both the investigation and the subsequent hearing, (b) deliberate refusal to provide Plaintiff with due process as defined by CWRU's own policies, (c) excessive and unbalanced focus on the concerns and interests of the female student complainant and the convenience of CWRU to the total exclusion of the rights and interests of the male Plaintiff, and (d) imposition of university discipline where Plaintiff's male gender was a motivating factor in the decision to discipline him.

3.      CWRU's unjustified actions violated its own Sexual Misconduct Policy, and the requirements of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX").

4.      Title IX is a federal law prohibiting gender-based discrimination at colleges and universities, which provides that: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

5.      During the final year of his first term in office, President Barack Obama made a Title IX policy decision to require American colleges and universities receiving federal tax money, including CWRU, to aggressively pursue charges of sexual misconduct made by students under a threat of losing federal funds. While the policy was ostensibly gender neutral, it was widely understood, including by CWRU's administration, to be aimed at prosecuting and punishing male students accused of sexual misconduct by female students.

6.      Pursuant to the policy, on April 4, 2011, Vice President Joe Biden told an auditorium full of students at the University of New Hampshire in Durham (UNH): "We are the first administration to make it clear that sexual assault is not just a crime, it can be a violation of a woman's civil rights."

7.      On the same day that Biden spoke at UNH, the United States Department of Education's Office of Civil Rights, acting pursuant to President Obama's policy, sent a 19-page document that would come to be known as the "Dear Colleague" letter to colleges and universities across the nation, including CWRU, federalizing the prosecution of alleged sexual misconduct complaints on college campuses. The letter contained new guidance about Title IX, the federal

statute prohibiting sex discrimination "under any education program or activity receiving Federal financial assistance."

8.      The "Dear Colleague" letter included a long section on best practices advising administrators to inform students reporting an assault of their options, and allow them to speak to the police. They should conclude investigations promptly—ideally, within two months. And hearing officers should decide cases of sexual harassment not "beyond a reasonable doubt," but by a "preponderance of evidence" standard—meaning hearing officers do not need to be convinced that an incident occurred, only that it is more likely than not that it did.

9.      The letter warned colleges: "When conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." The 19-page letter only contained two sentences that directly addressed the rights of the accused.

10.     Professor Janet Halley, Director of the Gender Violence Program at Harvard Law School, warned that the sexual battery policies imposed by the Obama Administration are all but designed to produce "false positives" — innocent students wrongfully punished — both because of the looser evidentiary standard and because of Title IX officers' desire to produce numbers that show they take sexual violence seriously.

11.     In April of 2011, CWRU hired Lawrence Mitchell to serve as the Law School's new Dean.

12.     Prior to hiring Mitchell, CWRU knew that Mitchell had a history of sexual relations with at least one of his students and others under his authority. Indeed, Pam Davis, Dean of the Medical School and co-chair of the search committee for Dean of the Law School, discouraged

hiring Mitchell because of various personal issues and a previous encounter with him in which he made inappropriate sexual comments, calling her a prude.

13.     Nonetheless, CWRU hired Mitchell, who later made inappropriate sexual comments to one of his colleagues, Raymond Ku (herein after referred to as "Ku").

14.     For example, during a faculty party on August 28, 2011, Mitchell made inappropriate comments to Ku regarding his penis in front of Ku's wife. Ku also witnessed Mitchell engaging in inappropriate physical contact with an Assistant Dean.

15.     The following week, a female colleague told Ku about Mitchell's harassment of two other female law professors. Ku deemed Mitchell's actions in violation of the sexual misconduct policy and reported him to the administration.

16.     CWRU suggested that Ku address the problems directly with Mitchell. When Ku did so, Mitchell threatened to fire Ku if he ever raised such allegations again.

17.     Ku filed a formal retaliation complaint, but CWRU backed Mitchell and dismissed Ku's claims of retaliation, stating that they were unsubstantiated. Mitchell continued to punish Ku by shutting him out of meetings, removing him from the Center for Law, Technology, and the Arts, and increasing his teaching workload.

18.     On October 23, 2011, Ku filed a lawsuit against CWRU.

19.     In December of 2011, Mitchell's own assistant pressed CWRU to open a sexual harassment investigation into his behavior. CWRU was reluctant to investigate Mitchell and on January 5, 2012, concluded after an initial informal inquiry that there was not enough evidence to launch a formal investigation, despite numerous claims of sexual harassment by both female professors and female students.

20.     Thereafter, Mitchell's assistant was reassigned outside of the law school and subsequently laid off.

21.     Mitchell resigned as Dean but kept his position as a tenured law professor and took a sabbatical as the lawsuit continued.

22.     In July of 2014, CWRU settled the lawsuit with Ku for an undisclosed settlement.

23.     Mitchell was scheduled to begin teaching again at CWRU in the Fall 2015 semester. There was a large amount of student push back against the return of Mitchell. The undergraduate student government fiercely debated passing legislation calling for the firing of Mitchell, and numerous students planned sit-ins and other protests upon Mitchell's return. Succumbing to this backlash, Mitchell resigned from his position at CWRU.

24.     Because of this incident, and fearful of additional public scorn and litigation, CWRU overhauled its Sexual Misconduct Policy.

25.     The        Policy        is        available        online        at https://students.case.edu/handbook/policy/sexual/doc/sexualmisconductpolicy.pdf.

26.     CWRU administrators were also instructed to take a hard line toward males for similar alleged offenses. CWRU decided that federal funds had to be saved at any cost, and that male students accused of sexual misconduct by female students should be prosecuted vigorously and never be given the benefit of any doubt.

27.     Plaintiff's prosecution by CWRU is an example of that fiat in action.

28.     CWRU desired to find him guilty regardless of the evidence to make an example to other male students and prove that the university took female students' complaints of sexual misconduct seriously. Further, CWRU's actions from the outset were focused on avoiding an OCR investigation at all costs. CWRU's decision-makers and investigators were thus motivated to favor

the accusing female over the accused male to protect themselves and the university from accusations that they had failed to protect female students from sexual misconduct.

29.     CWRU was aware of the school's specific negative public attention, as well as the national wave of news media coverage surrounding colleges not taking an offensive and aggressive approach to combat critical coverage.

## PARTIES

30.     Plaintiff is originally from Williamsville, New York, although he currently lives in Cleveland. During the events described below, Plaintiff was a full-time undergraduate student at CWRU and resided in a privately-owned fraternity house.

31.     CWRU is a residential institution of higher learning with its campus located at 10900 Euclid Avenue, Cleveland, Ohio, 44106.  It has more than 4,500 undergraduates and 5,500 graduate students, and receives federal funds pursuant to Title IX.

## JURISDICTION AND VENUE

32.     This Court has federal question and supplemental subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the claims herein arise under federal law; and (ii) the state law claims asserted in this pleading are so closely related to ands intertwined with the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

33.     This Court has personal jurisdiction over CWRU as CWRU is located in and conducts business within the Northern District of Ohio.

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted by Plaintiff occurred in this judicial district.

**FACTUAL ALLEGATIONS**

35.     Plaintiff grew up the only child of middle-class parents in a home where education is held in high esteem. Plaintiff worked diligently in high school, succeeded in eight (8) advanced placement courses, earned thirty-two (32) transfer credits toward his degree from CWRU and graduated with a 98.3 average. While in high school, Plaintiff was a two-year varsity athlete, a member of National Honor Society, a member of student government, serving as the Student Body President his senior year. Plaintiff scored in the 99th percentile in the ACT standardized college entrance examination.

36.     Setting his sights on a top tier education, Plaintiff applied to numerous Ivy League and other top tier programs. He ultimately chose CWRU and entered the Class of 2017.

37.     Upon his acceptance, CWRU provided Plaintiff with copies of its school policies, including the Sexual Misconduct Policy for Students.

38.     Shortly after starting his freshman year at CWRU, Plaintiff became a member of the Undergraduate Student Government, a member of a fraternity where he held several leadership roles, and earned a position as an undergraduate researcher in the Sankaran Laboratory.  During his sophomore year, Plaintiff began volunteering weekly at Circle Health Services (formerly known as The Free Medical Clinic of Greater Cleveland) as an HIV Intervention Specialist.

39.     Through his student advocacy in the student government, philanthropic work through his fraternity, and volunteering at the Free Clinic, Plaintiff was a positive impact on both his school community and the Greater Cleveland Community.

40.     During his sophomore year, Plaintiff's story was used for a promotional video meant to encourage donations to CWRU's scholarship fund. And during his junior year, Plaintiff was featured on the cover of CWRU's semester magazine THINK and was featured in a story

covering the research laboratory where we worked. His pictures were used in other promotional capacities by CWRU, including on department websites and promotional flyers.

41.     Plaintiff and Jane Roe met at the beginning of their freshman years in October of 2013.

42.     During their freshman year, Plaintiff and Roe spent time doing homework together, and started dating in February 2014.

43.     During their sophomore and junior years, Plaintiff and Roe effectively lived together, alternating sleeping in one another's rooms. Plaintiff and Roe often went out on the weekends together to social gatherings all throughout their relationship.

44.     On the night of November 14, 2015, Plaintiff and Roe attended Plaintiff's fraternity "date party" in Cleveland where they both voluntarily consumed alcohol.

45.     Shortly after arriving, and while Roe was in the bathroom, Plaintiff began dancing with one of his female friends. When Roe returned, she was angry, accused him of cheating, and an argument ensued. Plaintiff and Roe proceeded to take an Uber ride from the party back to Plaintiff's fraternity house.

46.     Upon returning to Plaintiff's residence, he and Roe continued arguing about the dance. Shortly thereafter, Roe pulled the fire alarm at the fraternity house.

47.     Once the fire alarm was activated, Plaintiff and Roe exited the building along with two of Plaintiff's fraternity brothers and another female. None of these witnesses had attended the date party and were thus sober.

48.     After the fire alarm was deactivated, Plaintiff went to sleep and Roe left the fraternity house at approximately 10:00 p.m.

49.      Shortly after 10:00 p.m., via text message, Roe claimed that Plaintiff had pulled the fire alarm, and had called her derogatory terms, including "a fucking bitch" and had told the others present to "keep that bitch away from me."  Furthermore, she claimed that Plaintiff had attempted to hit her, and that both of Plaintiff's fraternity brothers had witnessed these events.

50.      Over the next few days, Plaintiff and Roe discussed what had happened that night. Plaintiff expressed regret for upsetting Roe but denied using derogatory language or attempting to hit her.  A few days later, the couple moved past these issues.

51.      Several weeks later, Roe confessed to Plaintiff that she was in fact the one who had pulled the fire alarm, but she had let Plaintiff take the blame for the incident. She made Plaintiff promise not to tell anyone, as she did not want others to think poorly of her for pulling the fire alarm. Additionally, Roe stated that, should the fraternity incur any fines for the false alarm, she would cover half of the fine if Plaintiff would pay the rest.  Plaintiff respected her wishes by not telling anyone that Roe had pulled the fire alarm.

52.      On April 29, 2016, Plaintiff and Roe attended an off-campus party where they consumed alcohol and were intoxicated. After returning to Roe's suite and visiting with her roommates, the couple went to bed. At some point in the night, Plaintiff and Roe awoke and began to argue.  Roe later alleged that Plaintiff battered her with a mattress and digitally penetrated her vagina without her consent that night.

53.      No witnesses were present during this alleged incident, but Roe used her cell phone camera to record two short segments of the argument.

54.      The first video depicted Plaintiff intoxicated and visibly upset. The second showed Plaintiff attempting to go to sleep while Roe yelled at him. Plaintiff also makes allegations of physical abuse by Roe, an incident that occurred moments before the video was recorded.

55.     Plaintiff and Roe discussed this argument the following days, and like before, moved past it.

56.     On May 7, 2016, both Roe and Plaintiff returned to their respective homes for summer break.

57.     On May 24, 2016, Plaintiff moved to Baltimore, Maryland to begin an internship. Later that week, Roe expressed concern and jealousy over a close friendship that Plaintiff had developed with another student, and on May 29, 2016, the couple broke up over the phone.

58.     Roe stated that she was "heartbroken" and "blind sighted [sic]" by the breakup. She expressed that, had they met later in life after completing their respective graduate degrees, they "could have been together forever."

59.     Almost immediately after the breakup, Roe expressed that she wanted a clean break and outlined a plan for them to avoid any interaction on campus.  This included both Plaintiff and Roe resigning from certain positions and avoiding each other on campus.

60.     Plaintiff asked Roe to delete the videos from the night of April 29, 2016, because he found them embarrassing.  Roe sent Plaintiff copies of the videos and then claimed that she had deleted her own copies. Roe then insisted that Plaintiff also delete his copies of the videos.

61.     In late August, Plaintiff contacted Roe to discuss returning her personal belongings still in his possession.

62.     On August 28, Plaintiff and Roe met for a short period to exchange personal items.

63.     Following this brief interaction, Plaintiff and Roe had no further contact.

64.     Near the end of the Fall 2016 semester, nearly six (6) months after the breakup and three (3) months since their last contact, Roe suddenly lodged allegations of intimate partner

violence and non-consensual sexual intercourse, both violations of CWRU's Sexual Misconduct Policy.

65.     On November 18, 2016, CWRU's Title IX Coordinator, Darnell Parker, called Plaintiff and asked him to come to his office. Parker and Dean Patterson (Dean of Students) informed Plaintiff that Roe had filed allegations of intimate partner violence and non-consensual sexual intercourse against Plaintiff. Parker took notes of Plaintiff's responses.  Plaintiff was utterly blindsided by these allegations, as he had not interacted with Roe in almost three (3) months.

66.     A formal letter setting forth the alleged policy violations was given to Plaintiff. He was informed that an interim separation had been put in place. This meant that Plaintiff was "persona non grata" and would have to complete the remainder of his coursework remotely and/or off campus. Parker indicated that exceptions to the "persona non grata" status could be made for final exams. He also expressed that the CWRU would do everything possible to complete the investigation and subsequent hearing by the end of the Fall Semester. Parker stated to Plaintiff that character witnesses were of little importance in sexual misconduct cases.

67.     CWRU's Sexual Misconduct Policy States that interim sanctions, including interim separation/suspension, can be put in place "to protect the safety and well-being of individuals involved in a complaint of sexual misconduct." It was later revealed that, when asked if Roe felt safe on campus, she stated that she felt that "she was not in any immediate danger." Furthermore, Plaintiff's lack of contact with Roe also provided proof that he was not a danger to her safety or well-being.

68.     Before Plaintiff left the Office of Student Affairs on November 18, 2016, he spoke with a counselor from University Counseling Services (UCS). Dean Patterson remained in the room for the entire conversation and Plaintiff did not feel comfortable speaking his mind with

11

Dean Patterson present.  This discouraged him from contacting UCS any further, causing him to deal with the emotional distress caused by these allegations largely on his own.

69.     Although Parker assured Plaintiff that Dean Harris would help him arrange to complete of his coursework, Plaintiff had to make these arrangements largely on his own. Mr. Parker also reversed his stance on granting exceptions for finals, forcing Plaintiff to find alternative accommodations to complete his finals off campus.

70.     Of concern was Plaintiff's final in EECS 302: Discrete Mathematics. This final was scheduled for 7:00 p.m. on Tuesday, December 13, 2016. On Friday, December 9, 2016, at approximately 4:00 p.m., Dean Harris informed Plaintiff that he could complete the final for EECS 302 off-campus, but he would be in charge of making these alternative arrangements. Plaintiff spent much of the following weekend emailing every department chair at Cleveland State University and the Cleveland Institute of Art in search of a proctor.

71.     Finally, approximately twenty-four (24) hours before the exam was scheduled to begin, Plaintiff secured an arrangement to take the exam at Cleveland State University, with a start time almost six (6) hours before the official scheduled start time.  Between the time lost making these alternative arrangements and the early start time, Plaintiff lost approximately twelve (12) hours of studying time, effectively a full day.

72.     On November 21, 2016, Mr. Parker informed Plaintiff that, due to Plaintiff's and Roe's previous involvement in the conduct process as student panelists, he would recuse himself from the case and a third-party law firm would conduct the investigation.

73.     On November 30, 2016, Plaintiff gave a second, more detailed statement to Diane Citrino and Lauren Thompkins, of the Law Firm of Giffen and Kaminski, LLC with his attorney present. They presented Plaintiff with a form regarding confidentiality and retaliation regarding

the allegations against him, and implied that Plaintiff should have signed the form during his first meeting with Mr. Parker. This was the first time the form was presented to Plaintiff.

74.     Throughout the investigation, every witness was questioned regarding Plaintiff's relationship with A.P., a female friend, and fellow student at CWRU. When being questioned directly, A.P. mentioned that in October Plaintiff and A.P. had "hooked up."  The investigators then pressed for further salacious details regarding the "hook up" for purely prurient interests.

75.     The Sexual Misconduct Policy states that a respondent has the right "[t]o not be questioned or have information presented about past sexual conduct or history with anyone other than with the complainant or respondent, unless related to a pattern of prior violations or behavior by the respondent that was substantially similar to the present complaint." Therefore, questions regarding Plaintiff and A.P.'s sexual history directly violated CWRU's Sexual Misconduct Policy.

76.     On December 12, 2016, Mr. Parker asked Plaintiff if he would be okay with the hearing being held after break, with every effort being made to have the case resolved before the start of the Spring 2017 semester.

77.     On December 14, 2016, Mr. Parker confirmed that the hearing would indeed be held after Winter break.

78.     On January 6, 2017, Rachel Hambrick from CWRU's Title IX office confirmed that the hearing would take place on Wednesday, January 18 at 12:00 p.m.  This would be during the first week of classes, ignoring Mr. Parker's promise to hold the hearing earlier. It also meant that Plaintiff was forced to miss his classes for the beginning of the Spring 2017 semester.

79.     On January 11, 2017, Plaintiff and his attorney attended a pre-hearing meeting, where they learned that the hearing was scheduled for both Wednesday, January 18th and Thursday, January 19th due to the large volume of witnesses. CWRU planned to call all fourteen (14)

witnesses who had given statements to testify during the hearing, which contradicted the original hearing notice.

80.     Following this meeting, Plaintiff and his attorney were allowed to view the entire file of evidence for the first time, including Roe's initial statements and allegations.

81.     On Tuesday January 17th, Plaintiff returned to the Office of Student Affairs to again view the evidence file in preparation for his hearing the next day. He noted that new text message threads submitted by Roe had been added to the file, yet he had not been informed of this new evidence.

82.     Additionally, when Plaintiff inquired about what witnesses would attend each of the two scheduled hearing days, he was told that they intended to get through all of the witnesses on January 18th. This was in contradiction to what he had been told at the pre-hearing meeting on January 11th, where he was told that the hearing had been scheduled to be split over the two days.

83.     On the day of the hearing, Mr. Parker was seen speaking with Roe's parents and a third unidentified women outside of the hearing room, even though he had recused himself based on a conflict of interest.

84.     Members of the panel displayed a clear bias against fraternities. Panelists often attempted to discredit witness testimony based on fraternity affiliation, and made multiple disparaging comments implying that Plaintiff's fraternity brothers were attempting to protect Plaintiff and the fraternity.

85.     This discrimination against male-only organizations inherently constitutes gender-based discrimination.

86.     The panelists also attempted to discredit Plaintiff's male witnesses by suggesting that they would lie about any wrong doing to enhance Plaintiff's chances of attending MIT in the

Fall of 2017.

87.     A panelist also asked inappropriate questions to A.P., one of the witnesses in the hearing.  Specifically, he asked her "if she had ever been in an abusive relationship." Additionally, he pressed for further details about Plaintiff's and A.P.'s intimate encounter in October of 2016. This again violated the respondent's rights outlined by CWRU's Sexual Misconduct Policy. Additionally, A.P. expressed to Plaintiff that she felt distraught after being asked if she had been in an abusive relationship herself and this affected the rest of her testimony, as well as causing her emotional distress for hours after the hearing.

88.     Chairman Jones required Plaintiff to speak first when giving both his opening and closing statement and when questioning all witnesses.  Further, CWRU unilaterally assigned the order of all witnesses who testified.  This was in direct contraction to the hearing protocol outlined in CWRU's Sexual Misconduct policy, which states that the complainant goes first followed by the respondent. This allowed Roe to rely on emotional appeals and skewed facts to make her case and afforded Plaintiff no opportunity to contest these facts, especially in his closing statement.

89.     When Plaintiff pointed out that Chairman Jones was not following the procedure outlined in the Sexual Misconduct Policy, Chairman Jones simply asserted that he was following a procedure that had been used in the past. Using any procedures other than those outlined in the Sexual Misconduct Policy is forbidden by the policy itself, and Plaintiff was never provided with a copy of any alternative procedure.

90.     To remedy CWRU's failure to follow its own Sexual Misconduct Policy, Plaintiff attempted to ask redirect questions, which Chairman Jones denied.

91.     Although CWRU stated that all fourteen (14) witnesses would be present, two (2) witnesses did not appear before the panel. Plaintiff was never notified in advance that these two

witnesses would not be present.

92.     Plaintiff's initial statement given to Mr. Parker was not present in Plaintiff's record of the evidence, although he was presented with a copy in the middle of the hearing.

93.     Chairman Jones failed to adequately control the hearing and allowed Roe to make numerous speculative statements and allowed her answers to questions to deviate far from the original question, especially in the case of simply "yes" or "no" questions.  Additionally, he did not prohibit panelists from asking numerous inappropriate or irrelevant questions.

94.     Chairman Jones did not allow witnesses to make statements and instead only allowed them to respond to questions.  This directly contradicted the procedure outlined in CWRU's Sexual Misconduct Policy.

95.     The hearing lasted approximately six (6) hours and concluded around 6:30 p.m.

96.     Following the conclusion of the hearing, Mr. Parker told Plaintiff that he would receive a decision within two business days.  Plaintiff did not receive a decision until January 23, at 4:00 p.m., which was outside of the two-business day period.  This necessitated Plaintiff missing additional classes.

97.     Plaintiff was found responsible for intimate partner violence on November 14, 2015, and both intimate partner violence and non-consensual sexual intercourse on April 29, 2016.

98.     CWRU gave no rationale behind their decision to find Plaintiff responsible of intimate partner violence on November 14, 2015, and blatantly ignored witness testimony which directly contradicted Roe's statements.

99.     In its rationale finding Plaintiff responsible for intimate partner violence and non-consensual sexual intercourse, the panel relied primarily on the false notion that Plaintiff claimed he had no memory of the night of April 29, 2016.  This directly contradicts both written statements

16

and hearing testimony.  The panel also stated that no witnesses provided evidence that would support Plaintiff's assertion that it is not in his nature to assault anyone.  But in making this bald claim, CWRU ignored all witness statements and testimony regarding Plaintiff's character and behavior.

100.    Furthermore, all but one the witnesses supporting Plaintiff were males and all but one of the witnesses supporting Roe were females. Based on the Panel's proffered rationale and statements made during the hearing, it clearly and deliberately ignored Plaintiff's witnesses' testimony and statements based upon male gender.

101.    Ultimately, CWRU expelled Plaintiff until Spring 2018, at which time he is permitted to reapply for admission.

102.    After the hearing, Plaintiff learned that a fraternity brother that he encountered Roe at ABC the Tavern on the night of January 19, 2017.

103.    Roe began yelling at the fraternity brother regarding both the allegations she had made against Plaintiff and the hearing itself.  The fraternity brother, who was not a witness to the investigation or the hearing, excused himself from the situation while Roe's friends attempted to stop her from yelling.

104.    This is a clear violation of the confidentiality and retaliation clauses within CWRU's Sexual Misconduct Policy.

105.    Plaintiff filed a formal complaint with Mr. Parker regarding this incident on January 26, 2016.  Mr. Parker acknowledged receiving the complaint on January 30, 2016.  As of the time of filing this lawsuit, Plaintiff is unaware of any investigation or other actions taken by the CWRU regarding this incident.

106.    Separately, when Chairman Jones advised Plaintiff of the outcome of the hearing,

Chairman Jones also advised that both parties had three (3) business days to submit an appeal. Furthermore, according to the Policy if the appeal grounds are deemed valid the appeal will be sent to the opposite party and they shall have three (3) business days to submit a reply.  The policy also states that CWRU shall attempt to resolve all appeals within ten (10) business days

107.  Plaintiff submitted an appeal before the deadline at 5:00 p.m. on January 26, 2017. The following day, CWRU acknowledged receiving the appeal and stated that the Office of Student Affairs would be in touch regarding the next steps.

108.  Plaintiff did not have any contact from CWRU until February 9, 2017. On that date, he was notified that Roe had also submitted an appeal and that Plaintiff had until February 14, 2017 to submit a reply.  Upon inquiry, he learned that his appeal was still being processed.

109.  CWRU's failure to resolve the appeal in a timely manner and violation of the three (3) day deadline to appeal is yet again a failure to follow its own procedures outlined in its Sexual Misconduct Policy.

110.  On February 17, 2017, Plaintiff was informed that his appeal was denied, without further explanation, therefore leaving no further recourse through the internal University process.

111.  In CWRU's finding that Plaintiff was responsible for sexual misconduct, Plaintiff was deprived of the most basic due process and equal protection rights and was discriminated against on the basis of his gender, which is evidenced in part by the following facts:

      a.  Plaintiff was wrongly separated from the university with no evidence that he posed any threat to Roe or the CWRU community in direct contradiction to the sexual misconduct policy making the completion of his Fall semester difficult and suspension of the beginning of the Spring semester;

18

b. Plaintiff was not informed of new evidence that was submitted by Roe following the pre-hearing meeting;

c. Plaintiff was instructed to make his opening statement, closing statement, and witness questions *before* Roe, directly contradicting the hearing protocol outlined in the sexual misconduct policy;

d. Plaintiff was denied the ability to ask redirect questions to witnesses, key witnesses were not allowed to make independent statements, in direct contradiction to the hearing protocol outlined in the sexual misconduct policy;

e. The hearing chairperson lacked control over the hearing, allowing Roe to make speculative statements and statements that deviated far from the original questions raised by the panel and Plaintiff;

f. The investigators and the panelists asked inappropriate and irrelevant questions regarding Plaintiff's sexual history with one of the witnesses, in direct violation of the plaintiff's rights outlined in the sexual misconduct policy;

g. Members of the Panel continually made reference to Plaintiff's fraternity and the potential fallout to the fraternity if Plaintiff was found to have violated any section of the Sexual Conduct Code;

h. CWRU failed to deliver a hearing outcome within two business days, in direct contradiction to the statement made by Parker to Plaintiff with respect to the Sexual Misconduct Policy;

i. CWRU failed to render a decision within ten (10) business days of the appeals being filed;

j. CWRU never responded to Plaintiff's reporting of a violation of the confidentiality

19

clause by Roe; and

k.  CWRU's failed to complete the entire hearing process in a timely manner, specifically within their sixty (60) day guideline.

112.  CWRU's arbitrary and capricious findings and disciplinary actions have caused Plaintiff harm. Plaintiff's educational career has been put on hold and his academic future has been severely damaged.

113.  His ability to attend MIT or Harvard University next year, where he has recently been accepted into both engineering PhD programs, is being threatened, the monies spent on obtaining a college education at CWRU squandered, and his psychological and emotional health has been greatly compromised by this entire ordeal.

## COUNT I
## (TITLE IX)

114.  Plaintiff realleges and incorporates by reference all preceding allegations.

115.  Title IX is a comprehensive federal law that prohibits discrimination on the basis of gender in any federally funded education program or activity. It states in part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

116.  The principal objective of Title IX is to avoid the use of federal money to support sex discrimination in education programs, and to provide individual citizens effective protection against those practices. Title IX prohibits the imposition of university discipline where gender is a motivating factor in the decision to discipline.

117.  CWRU receives federal funding for research and development and for other purposes.

118. Both the U.S. Department of Education and the U.S. Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice). Such prohibited actions include all forms of sexual harassment, including nonconsensual sexual intercourse, sexual assault, and rape.

119. In January of 2001, the United States Department of Education, Office for Civil Rights, published a set of compliance standards for Title IX educational institutions to apply in sexual harassment matters, including standards for "Prompt and Equitable Grievance Procedures" and "Due Process Rights of the Accused." 66 F.R. 5512 ("OCR Standards"). This "Guidance" is available online at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

120. The OCR Standards require covered institutions like CWRU not only to "ensure the Title IX rights of the complainant," but also to "accord[ing] due process to *both* parties involved." (italics supplied).

121. The OCR Standards require schools to adopt "prompt and equitable" procedures including, at a minimum:

   a. "Notice . . . of the procedure, including where complaints may be filed";

   b. "Application of the procedure to complaints alleging [sexual] harassment...";

   c. "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

   d. "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

   e. "Notice to the parties of the outcome of the complaint..."

122.    The OCR Standards also require Title IX schools like CWRU to ensure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults'."

123.    CWRU's overall sexual misconduct complaint program as applied in Plaintiff's case fails to comply with the OCR standards in several ways, including (but not limited to):

   a.   Failing to comply with procedures set forth in its Sexual Misconduct Policy;

   b.   Instead, adopting and implementing procedures that afford greater prerogatives and protections to the (female) accuser than to the (male) accused; and

   c.   Failing to provide adequate training for the CWRU employees charged with the responsibility of protecting students' rights under Title IX.

124.    In its pre-hearing investigation of the complaint against Plaintiff, CWRU failed to comply with Title IX's due process standards generally, as well as the OCR Standards, in multiple ways, including without limitation:

   a.   Failing to perform a prompt, thorough, and impartial investigation of all evidence from both parties;

   b.   Failing to investigate beyond the materials voluntarily provided by the parties; and

   c.   Failing to retrieve documentary and physical evidence relevant to the investigation.

125.    In its conduct of the adjudicatory conduct hearing, CWRU failed to comply with Title IX's due process standards generally, as well as the OCR Standards, in multiple ways, including, without limitation:

   a.   Effectively presuming Plaintiff's guilt, including making him persona non-grata, because of his male gender before an investigation into the accusations against him had even begun;

22

b. Failing to challenge Roe's numerous inconsistencies in her statements or to consider seriously the lack of corroboration of her claims of violence, especially considering the eyewitness testimony rebutting her claims, and non-consensual sexual contact because of her female gender; and

c. Failing to adequately consider exculpatory evidence or the statements/testimony of key witnesses in support of Plaintiff's defense of consent because of Plaintiff's, and the witnesses, male gender.

126. In reaching its decision and imposing sanctions on Plaintiff, CWRU, being motivated by a discriminatory intent against Plaintiff because of his male gender, deprived Plaintiff of the due process and equal protection rights required by the OCR Standards by, among other things:

a. Finding Plaintiff responsible as charged under flawed procedures notwithstanding the complete lack of evidence to corroborate Roe's allegations and Roe's own inconsistent statements; and

b. Imposing sanctions that were unwarranted and disproportionate to the severity of the charge levied against Plaintiff without any consideration of his clean disciplinary record at CWRU and the lack of any aggravating circumstances.

127. In one of the videos submitted by Roe, Plaintiff alleged physical abuse by Roe. However, CWRU did not investigate this claim. No official report or investigation of this claim was made, in direct violation of CWRU's Sexual Misconduct Policy.

128. In both Plaintiff's and Roe's allegations of physical abuse, no witnesses were present nor was any physical evidence provided. For Roe's allegations, an investigation was

launched and a subsequent hearing was held.  For Plaintiff's allegations, no action was taken on CWRU's part.

129.    This constitutes a clear selective enforcement of CWRU's Sexual Misconduct Policy, demonstrating a gender bias against males on CWRU's part.

130.    Furthermore, when Plaintiff filed an official complaint regarding Roe's blatant violation of CWRU's confidentiality and retaliation clauses of the Sexual Misconduct Policy, no action was taken by CWRU.

131.    This lack of action again demonstrates selective enforcement of CWRU's Sexual Misconduct Policy and a gender bias against males.

132.    By treating Roe, a female, more favorably than Plaintiff in its disciplinary investigative and adjudicatory process, CWRU discriminated against Plaintiff because of gender, the discrimination was intentional, and the discrimination was a substantial and/or *the* motivating factor for the CWRU's actions.

133.    CWRU has deprived Plaintiff, because of his sex, of his due process and equal protection rights through the flawed enforcement of guidelines and regulations that are unfair and imbalanced to male students while unduly favoring female students, and the failure to implement the limited protections that appear in those guidelines and regulations.

134.    CWRU's Sexual Misconduct Policy also suit its institutional convenience, accommodating pressures imposed upon it by recent national media focus on campus sexual misconduct, its own mismanagement of its former law dean's sexual misconduct, and campus investigations by the Department of Education's Office of Civil Rights.

135.    Based on the foregoing, CWRU engaged in a series of actions that ultimately resulted in the panel's erroneous finding that Plaintiff had engaged in sexual misconduct. Their

decision was the result of intentional discrimination against Plaintiff based on his male gender, in violation of Title IX.

136.     The erroneous outcome of the Conduct Hearing was due to gender bias against Plaintiff, as demonstrated by the multiple procedural and adjudicatory missteps demonstrated by CWRU throughout the entire investigative and disciplinary process favoring Roe to the detriment of Plaintiff because of his male gender.

137.     CWRU is primarily concerned with its image and reputation to current and potential incoming students and their parents, rather than its obligations to provide a fair and equitable investigative process to all its students regardless of gender.

138.     Plaintiff suffered an erroneous outcome when CWRU found him responsible for sexual misconduct based on his gender, and the discrimination was willful, deliberate, and intentional.

139.     CWRU's violations of its obligations under Title IX proximately caused Plaintiff to sustain tremendous damages, including, without limitation, emotional distress, economic injuries, harm to his pending graduate education and subsequent career reputational damages, and the loss of educational opportunities and other direct and consequential damages.

140.     Plaintiff is entitled to compensatory damages for the harm he suffered because of CWRU's willful violation of its Title IX obligations.

141.     As a direct and proximate result of the CWRU's foregoing wrongful acts, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' and expert witness fees, litigation expenses, and court costs and disbursements pursuant to 42 U.S.C. § 1988(b).

## COUNT II
## (BREACH OF CONTRACT)

142.    Plaintiff realleges and incorporates by reference all preceding allegations.

143.    Under Ohio state law, CWRU had contractual obligations to the Plaintiff, including under the Student Code of Conduct, the Title IX policies, and other university policies affecting students. CWRU created express and implied contracts when Plaintiff accepted an offer of admission to CWRU, paid the tuition and fees, moved into a university dormitory, and attended classes.

144.    CWRU promised to allow its community members, including Plaintiff, to live in a discrimination-free environment.

145.    CWRU committed numerous investigative and procedural missteps, failed to engage in impartial fact finding, failed to fairly weigh evidence presented by Plaintiff, and harbored an overall institutional gender bias against Plaintiff as the male student accused of sexual misconduct by a female student during his student conduct hearing, and prior thereto, all of which led to the erroneous decision.

146.    CWRU's discrimination of Plaintiff because of his male gender breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

147.    CWRU has deprived Plaintiff of his contractual rights to due process and equal protection through the improper administration of the student conduct hearing process in violation of CWRU's guidelines and regulations.

148.    Plaintiff is entitled to recover damages for CWRU's breach of the express and/or implied contractual obligations described above.

149.     Based on the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT III**
**(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)**

150.     Plaintiff realleges and incorporates by reference all preceding allegations.

151.     Based on the facts and circumstances, CWRU breached a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by meting out a disproportionate sanction against Plaintiff, notwithstanding the lack of evidence in support of Roe's claims of non-consensual sexual intercourse and intimate partner violence, and by not enforcing the Student Code of Conduct against the underage students for consuming alcohol in a university dormitory. The sanctions against Plaintiff are also disproportionate considering that Plaintiff had no prior history of misconduct.

152.     As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, economic injuries, and other direct and consequential damages.

153.     Plaintiff is entitled to recover damages for CWRU's breach of the express and/or implied contractual obligations described above.

154.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT IV**
**(INJUNCTIVE RELIEF)**

155.     Plaintiff realleges and incorporates by reference all preceding allegations.

156.     By virtue of CWRU's violation of Plaintiff's contractual, due process, and equal protection rights, including under Title IX, Plaintiff has suffered irreparable harm for which money

damages are an inadequate remedy.

157.    To address that harm, Plaintiff is entitled to injunctive relief from this Honorable Court ordering CWRU to (i) reverse the outcome and findings made by the hearing panel as agents and on behalf of CWRU against Plaintiff finding him guilty of sexual misconduct; (ii) expunge all negative references contained in Plaintiff's disciplinary record; (iii) remove all references of Plaintiff's suspension and sanctions from his education file, and (iv) permanently destroy any record of Plaintiff's conduct hearing and findings resulting from it.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues presented herein.

/s/ Matthew A. Dooley
Matthew A. Dooley    (0081482)

**WHEREFORE**, for the foregoing reasons, and based on the evidence to be presented at trial, Plaintiff respectfully requests the following relief against CWRU:

A.    An award of compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional distress, economic injuries, and other direct and consequential damages, plus prejudgment interest, attorneys' and expert witness fees, expenses, costs, and disbursements;

B.    The issuance of an injunction ordering CWRU to:

    i.    reverse the outcome and findings made by CWRU following Plaintiff's panel hearing;
    ii.    restore Plaintiff's good standing at CWRU, including his scholarships and other financial aid;
    iii.    expunge any negative references from Plaintiff's disciplinary record;
    iv.    remove the record of Plaintiff's expulsion from his education file; and
    v.    permanently destroy any record of Plaintiff's panel hearing and resulting penalties; and

C.    Such other and further relief as the Court deems just, equitable and proper.

Respectfully submitted,

O'TOOLE, McLAUGHLIN, DOOLEY &
PECORA CO., LPA

/s/ Matthew A. Dooley
Matthew A. Dooley    (0081482)
Stephen M. Bosak, Jr. (0092443)
5455 Detroit Road
Sheffield Village, Ohio  44054
Tel:          (440) 930-4001
Fax:          (440) 934-7208
Email:        sbosak@omdplaw.com
              mdooley@omdplaw.com

CHRISTOPHER G. THOMARIOS, ESQ., LLC.
Christopher G. Thomarios (0076637)
820 W. Superior Ave., Suite 840
Cleveland, Ohio 44113
Tel:     (216) 696-8217
Fax:     (216) 696-9292
Email: christopher@cgt-law.com
*Counsel for Plaintiff John Doe*